UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BARBARA EWING, As Next Friend and Guardian of the Person of GEOFFREY EWING, II, An Incapacitated Person; SHARON CORTEZ, As Next Friend and Guardian of the ESTATE OF GEOFFREY EWING, II, An Incapacitated Person; and TIFFONY HOPPER, As Next Friend of GME, III, a Minor, Plaintiffs, | § § § § § § § § § § § | |
| vs. | § § | CIVIL ACTION NO.: 3:10-cv-1211-0 |
| IRON TIGER LOGISTICS, INC., and KENNETH DEWAYNE BUNTON, Defendants. | § § § § | |

## DEFENDANTS KENNETH BUNTON AND IRON TIGER LOGISTICS, INC.'S UNOPPOSED MOTION FOR CONTINUANCE OF TRIAL SETTING AND EXTENSION OF DISCOVERY AND MEDIATION DEADLINES

**TO THE HONORABLE JUDGE OF SAID COURT:**

COME NOW, Defendants Kenneth Bunton and Iron Tiger Logistics, Inc., Defendants in the above-referenced case and file their Unopposed Motion for Continuance and Extension of Discovery and Mediation Deadlines.

### I.

### FACTUAL BACKGROUND

1.      This case is currently scheduled for trial on April 4, 2011, one year and seventeen days after the subject accident. This is the first trial setting. This motion is made prior to the expiration of the discovery deadline of February 25, 2011.

2.      This matter arises from an accident which occurred on March 18, 2010 on US 75 near the border between Texas and Oklahoma. Defendant Kenneth Dewayne Bunton ("Bunton") was

employed with Defendant Iron Tiger Logistics, Inc. ("Iron Tiger") as a commercial truck driver at the time of the accident. Bunton was driving a commercial motor vehicle north on US 75 in the course and scope of his employment with Iron Tiger when he struck the rear of a vehicle driven by Plaintiff Geoffrey Ewing, II near the Oklahoma border. As a result of the accident, Plaintiff Geoffrey Ewing II ("Ewing") claims to have suffered a severe traumatic brain injury.

3.      The parties have diligently conducted discovery in this case. Thus far, the depositions of Defendant Bunton and ten employees of Defendant Iron Tiger have occurred. The depositions of Ewing's mother and sister have been taken, as well as the deposition of his treating neuropsychologist. The liability experts for each side are scheduled to occur prior to the current discovery deadline.

## II.

## GROUNDS FOR CONTINUANCE AND DEADLINE EXTENSIONS

4.      The need for the continuance is not due to any lack of diligence on behalf of the parties to the case. Ewing underwent a neuropsychiatric evaluation by Dr. Ron Paulman on July 20, 2010 as a part of his course of his treatment, just four months after the injury. Dr. Paulman's evaluation documents significant deficits in Ewing's brain function. The report further recommends that Ewing undergo an additional evaluation one year from the date of the accident in order to assess his recovery and documents that further recovery is expected at the time of the repeat examination. *See* Tab 1, p. 9. Ewing has since been receiving daily outpatient therapy for his brain injury at the Center for Neurological Skills in Irving, Texas. The additional neuropsychological evaluation recommended by Dr. Paulman is currently scheduled to be performed on March 22, 2011, which is after the current discovery deadline and less than two weeks prior to the currently scheduled trial.

5.      Defendants timely designated experts in the fields of vocational rehabilitation/life care planning (Rodney Isom, Ph.D.), neurology (William Woodfin, M.D.), and neuropsychiatry (Leslie Rosenstein, Ph.D.), on January 11, 2011 and their reports were filed with the Court on that same day.  Each of the experts designated by Defendants have stated in their reports that because of the nature of Ewing's claimed traumatic brain injuries, the extent of the brain injury cannot be adequately addressed until the follow up neuropsychological evaluation is performed on March 22, 2011. The opinions of these experts will be discussed below.

6.      Rodney Isom, Ph.D. is a rehabilitation consultant who has reviewed all of the pertinent records documenting medical treatment received by Ewing.  According to Dr. Isom, a repeated neuropsychological examination needs to be performed as recommended by Dr. Paulman because there can be significant improvement in individuals who have suffered traumatic brain injuries within one year following the injury, with significant spontaneous recovery occurring between the sixth and twelfth month. *See* Tab 2, p. 10.  Dr. Isom cites case studies in his report supporting the need for repeat neuropsychological evaluations at one year post injury due to the potential for significant spontaneous recovery in the first year post injury.  Dr. Isom further opines that the repeat examination is necessary to reliably evaluate Ewing's employment opportunities, ability to benefit from vocational rehabilitation, his earning capacity, and future medical and care needs. *Id.* p. 11.

7.      William Woodfin, M.D. is a practicing neurologist who specializes in the treatment of acute and chronic head injuries and disorders of the peripheral nervous system.  Dr. Woodfin has reviewed all of the pertinent records documenting medical treatment received by Ewing.  Dr. Woodfin reports that it is difficult to provide a prognosis for Ewing's head injury based on a neurological examination performed so soon after the accident.  *See* Tab 3, p. 17.  He

recommends that Dr. Paulman perform an updated neuropsychological examination no earlier than one year from the date of injury. According to Dr. Woodfin, the follow up examination is necessary to give fair and reasonable consideration to all parties.

8.     Leslie Rosenstein, Ph.D. is a board certified neuropsychologist practicing in Austin, Texas. Dr. Rosenstein has reviewed the records of medical treatment provided to Ewing. It is Dr. Rosenstein's opinion that it is not possible to speculate with any degree of certainty what Ewing's prognosis is for recovery and future functioning. Further, she agrees that a significant degree of further recovery is expected beyond four months post injury. *See* Tab 4, p. 18.

9.     Defendants are substantially prejudiced without a continuance as requested because they will not be provided an opportunity to fully evaluate the repeat neuropsychological examination which Ewing is scheduled to undergo on March 22, 2011. Defendants will not be afforded an opportunity to evaluate the extent of Ewing's recovery without a continuance. A short continuance of this matter will allow a full development and presentation of the evidence regarding Ewing's damages to a jury.

10.     Defendants seek the continuance for settlement purposes as well. In order for mediation to have a reasonable chance of success, the Defendants need an opportunity to fully evaluate the extent of Ewing's brain injury and need for future care. Without the results of a neurological examination performed one year following the accident, Defendants are left to speculate as to Ewing's injuries and future needs. Should the Court grant the request for continuance, counsel for Plaintiff and Defendant have reached an agreement to exchange the results of the follow up neuropsychological examination by April 4, 2011, which is within 14 days of the scheduled March 22, 2011 examination. Further, the parties have agreed to mediate the case in May 2011

with the court appointed mediator, Mark Gilbert, which should allow the parties and their experts to fully evaluate the extent of Ewing's recovery.

11.     The continuance is not sought for purposes of delay, but so that justice may be done. Defendants request that this case be set for jury trial within the thirty day window beginning June 13, 2011. <u>Due to scheduling conflicts, Defendants request that the case not be scheduled for trial during the week of June 20-24, 2011.</u> Counsel for Plaintiff is available for trial during this same time frame as well. Defendants request that the mediation deadline be extended until May 16, 2011 and that the discovery deadline be extended until May 27, 2011.

### III. CONCLUSION

Defendants seek a continuance of the trial setting and the mediation and discovery deadlines in order to allow the full development of the extent of Plaintiff's Geoffrey Ewing II damages.

WHEREFORE, PREMISES CONSIDERED, Defendants Kenneth Bunton and Iron Tiger Logistics, Inc. move this Court to grant their Unopposed Motion for Continuance and Extension of Discovery and Mediation Deadlines in all respects and for such further relief to which Defendants may be entitled.

Respectfully submitted,

**STACY & CONDER, LLP**


By:_____ /s/ David G. Allen _____
      Roy L. Stacy
      State Bar No. 18988900
      David G. Allen
      State Bar No.  00786972

      stacy@stacyconder.com
      allen@stacyconder.com

901 Main Street, Suite 6220
Dallas, Texas 75202
(214) 748-5000
(214) 748-1421 (fax)

**ATTORNEYS FOR DEFENDANTS**


## CERTIFICATE OF SERVICE

On January 19, 20101 I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


      /s/ David G. Allen _____
      David G. Allen

## VERIFICATION

STATE OF TEXAS            §
                         §
COUNTY OF DALLAS          §

BEFORE ME, the undersigned Notary Public, on this day appeared David G. Allen, who being by me duly sworn on his oath deposed and said that he is an Attorney of Record for Kenneth Bunton and Iron Tiger Logistics, Inc.; that he has read the above and foregoing Motion for Continuance; and that the facts contained therein are within his personal knowledge and are true and correct.

David G. Allen

SUBSCRIBED AND SWORN TO BEFORE ME on this 18th day of January, 2011 to certify which witness my hand and official seal.

PAMELA M. FIELDS
Notary Public, State of Texas
My Commission Exp. 05-27-2013

Notary Public in and for the State of Texas

# APPENDIX

**Tab 1 – Report of Dr. Ron Paulman (pp 1-9)**

**Tab 2 – Report of Dr Rodney Isom (pp 10-14)**

**Tab 3 – Report of Dr. William Woodfin (pp 15-17)**

**Tab 4 – Report of Dr. Leslie Rosenstein (pp 18)**

1

**Office of Ronald G. Paulman, Ph.D.**

**Clinical Neuropsychology**

Ronald G. Paulman, Ph.D.
*Clinical Neuropsychology*

Kathleen C. Saine, Ph.D.
*Clinical Neuropsychology*

9400 N. Central Expwy., Suite 1212
Dallas, Texas 75231-5032
214-373-4688 • 214-373-9614 (Fax)

### Neuropsychological Evaluation

**Name:** Geoffrey Ewing

**Age:** 38

**D.O.B.:** 09/21/1971

**Education:** Bachelors Degree

**Handedness:** Right

**Referral Source:** Centre for Neuro Skills

**Date Evaluated:** 07/20/2010

**Identification/Reason for Referral:**

Geoffrey Ewing is a 38-year-old married white male teacher/coach who sustained a traumatic brain injury in a motor vehicle accident on 03/18/2010, when his vehicle was struck from behind by a tractor-trailer while stopped in a construction zone on State Highway 75 near Denison, Texas. His car flipped over and he is amnestic for the impact and its aftermath. He was transported acutely to Parkland Hospital in Dallas and subsequently was transferred to an extended care facility (Life Care of Dallas) on 04/05/10. He was later treated at Baylor Institute for Rehabilitation and, more recently, entered the Centre for Neuro Skills (CNS), where he was admitted on 05/19/2010, for post-acute rehabilitation. The current neuropsychological evaluation was requested to provide a comprehensive survey of Mr. Ewing's present cognitive and emotional functioning to inform further treatment and disposition planning with him.

**Sources of Information:**

Information contained in this report was primarily obtained through interview with Mr. Ewing. In addition, his mother was interviewed by phone to provide information surrounding his past and current functioning. Limited medical records were also available and reviewed. These include the Preliminary Evaluation Report by CNS (05/14/10) and the Initial Conference Summary (05/19/10) from CNS. No past medical records or records surrounding his acute injury or treatment are available at this time.

**Developmental, Educational, & Occupational History:**

Mr. Ewing was born and raised in Dallas. His parents divorced when he was one year old and he has a half-sister put up for adoption by his mother in her teenage years. He was not raised with her though the patient and his mother have had contact with her in recent years.

Mr. Ewing's father suffered from hemiplegia sustained in a motor vehicle accident when the patient was four years old. He died at age 38 from unspecified causes. Mr. Ewing's mother is 58 years old. She previously worked in an office and for a travel agency though is currently a caretaker for her mother.

1

Neuropsychological Evaluation
Geoffrey Ewing
-Page Two-

According to available information, Mr. Ewing was a full-term infant with an unremarkable early medical/developmental history. He attended St. Philip and Blanton Elementary Schools as well as Gaston Junior High and Bryan Adams High School in Dallas. He reports that he was a "B" student in his grade school years with history his best subject, but math weaker for him. He had no grade failures or specialized placements. His grades fell to a "C" level in junior high and high school, however, where he was actively involved in sports. He graduated in 1990, in the bottom third of his class, by his report.

Following high school, Mr. Ewing attended East Texas State University in Commerce, Texas, (now Texas A&M University at Commerce), majoring in Criminal Justice. He also played football for two years, although this ended with a neck problem. He obtained his Bachelor's degree in 1994, with a 3.09 GPA.

Mr. Ewing's work history began at Century 21 Real Estate, working in property insurance and sales. He remained with that job until 2001, when he went to work in sales for a company providing office security services. This ended in 2005. He subsequently became a special education teacher and coach in a junior high school in Terrell, Texas. He worked as a teacher and coach at a Dallas Independent School District middle school in 2007-08, followed by high school/junior high positions in a similar capacity at Mt. Pleasant, Texas. Mr. Ewing joined Whitewright ISD in 2009, and has been a geography teacher and football/basketball coach there. His goal is to return to health and resume his teaching and coaching roles in his school.

Mr. Ewing has been married twice, but is currently divorced. The first marriage lasted for eight years and the second for only nine months, ending in 2002. He has a 14-year-old son, whom he sees one to two times a week and every other weekend. His son is a sophomore at a high school in Quinlan, Texas, and Mr. Ewing relates that they have a close relationship. Prior to his injury, Mr. Ewing lived by himself in Savoy, Texas. He is currently in the CNS residential facility and is scheduled for imminent discharge to home and day-treatment status. The patient was in a relationship with a woman until recently, though reports that this has now been terminated.

Medical History/History of Current Problem:

Mr. Ewing's prior medical history is positive for at least two concussive injuries while playing high school and college football. There were no significant sequelae from these events, by his report, nevertheless. Mr. Ewing relates that his past medical history is negative for any significant medical issues, though his CNS report does cite "borderline hypertension" and problems with "heart skipping" in ninth grade. Mr. Ewing has had no surgeries. He has not used tobacco, with the exception of an occasional cigar. He is a light-to-moderate user of alcohol (three drinks a week). His previous psychiatric history is negative. However, he does report that he underwent "ADD" testing in either 1999 or 2000 in Dallas, though results of that evaluation were negative for that condition.

Mr. Ewing reports that his accident occurred on 03/18/10, while traveling northbound on State Highway 75, near Denison, Texas, while on spring break. While stopped in a construction zone, he was rear-ended by an 18-wheeler at that time that was traveling at a high rate of speed. The impact to the rear-left passenger side of the car flipped it over. The patient relates having no retrograde amnesia leading up to the event, though he is amnestic for the impact itself, with his next memory that of awakening in a hospital that he falsely believed to be a Veterans Affairs Medical Center. He also believed that he had been injured in combat at that time. (Notably, Mr. Ewing was in the Army Reserves from 1992 to 2000 and his unit was deployed to Iraq, though he remained in the United States).

Available records indicate that Mr. Ewing was transported to Parkland Hospital in Dallas, where his CT scan showed parafalcine subarachnoid hemorrhage, right temporal/occipital contusions, left parietooccipital subdural hematoma, and intraventricular hemorrhages. He underwent right frontal ventriculostomy at that time and chest injuries required chest tube placement. He also had other traumatic injuries including rib fractures, right humerus fracture, right scapular fracture, and right T1 transverse process fracture (see records for a full description).

Mr. Ewing relates that he was in induced coma for nearly one month and transferred to Life Care of Dallas, in the extended care facility. At that time, he developed secondary infections, but improved to the point where he was showing greater movement in his extremities as well as improving verbal behavior. The patient is amnestic for that entire period of time. He was subsequently transferred to Baylor Institute for Rehabilitation on 04/14/10, under the care of Mary C. Carlile, M.D. He continued to show problems with right upper extremity function at that time and

Neuropsychological Evaluation
Geoffrey Ewing
-Page Three-

an apparent left homonymous hemianopsia and moderate myopia were identified in association with his injuries.

A CT scan of 05/11/10 found periventricular and subcortical white matter changes as well as encephalomalacia in the right temporal lobe, the latter likely associated with trauma. The patient was placed on neurostimulant medications and showed improved alertness and attention. He was diagnosed with reflex sympathetic dystrophy (RSD) and underwent stellate-ganglion block. He was also placed on Neurontin and Lyrica, as well as a Lidoderm patch and a TENS unit.

Mr. Ewing continued to be followed in multidisciplinary therapies and was discharged to transitional rehabilitation on 05/19/10, with increasing focus upon higher-level cognitive skills, as continued problems were seen with detail attention and impulsivity.

Mr. Ewing underwent evaluation for entry into the CNS program on 05/14/10. At that time, the patient ambulated with a wheelchair and had a right hand splint. He also wore a patch for diplopia. He exhibited few problems with receptive speech, but did exhibit higher-level cognitive and executive deficits. His expressive speech functions were globally intact conversationally. Other assessments found him to require assistance with transfers, meals, and other self-care functions (see report). Recommendation was made for participation in a comprehensive post-acute rehabilitation program at that time.

Mr. Ewing subsequently entered the CNS program on 05/19/10. A conference summary of 06/14/10 relates that his initial cognitive evaluation with the Woodcock-Johnson-III Test of Cognitive Abilities suggested particular problems with executive and higher-level functions as well as attention, within the context of suppression in a range of other cognitive abilities. Functionally, he exhibited difficulty with judgment in undertaking ambulation and physical activities, as well as mild behavioral issues, including irritability and anger when frustrated.

Current Symptoms & Complaints:

At the time of the current assessment, Mr. Ewing continues to report problems in a number of physical and cognitive areas despite significant improvement over the course of his rehabilitation. Although he is able to ambulate without assistance or difficulty, he does report some diminished coordination. He notes that his lower extremity strength is returning and he is capable of walking two miles at a time on a treadmill. His left upper extremity is limited with respect to his grip strength and dexterity and he currently has no significant use of his right hand which is in a sling.

Mr. Ewing relates that he is currently able to self-manage all ADLs, but does have a walk-in shower at CNS, that will not be available in the home. He dresses without difficulty, but can be unsteady in putting on shoes or socks. Mr. Ewing relates that heat greatly contributes to his fatigue and other functional issues. He has not driven since the accident and relates this primarily to his visual problems. Currently, his diplopia has resolved, though he relates some continuing difficulties with the left field as well as depth perception. Some blurring can also occur after he has fixated on objects for a period of time.

With respect to sensory functions, Mr. Ewing reports that his right hand experiences pain as well as numbness, tingling, and pins-and-needles sensations. He also relates that he continues to experience pain elsewhere. He has headaches that he associates with sinus problems and these occur in the middle of his head. He denies any problems with taste/smell or hearing at this point.

Cognitively, Mr. Ewing relates that he has isolated memory difficulties. He may forget his own phone number, but not those of other individuals. He denies any problems in recalling conversations, names, or faces. He relates feeling more distractible since prior to his injury however. Mr. Ewing has few complaints surrounding current speech functions. He does report some diminished reading and writing that he relates to visual and mechanical issues. With respect to instrumental abilities, he is attempting to resume control of his finances and has frustration and irritation over his sister's continuing role of financial guardian.

Mr. Ewing's provides only a partial list of his current medications and the reader is referred to his current CNS records for a complete accounting. He reports presently taking amantadine 100 mg, q. am, Celexa 20 mg. q. am, Desyrl 120 mg., Flonase, Lidoderm patch, and loratidine 10 mg. q. am.

Neuropsychological Evaluation
Geoffrey Ewing
-Page Four-

Separately, Barbara Ewing, the patient's mother, describes wide-ranging changes in her son's ongoing cognitive, personality, and behavioral functioning. Cognitively, Mr. Ewing is described by his mother as having a greatly decreased attention span. He tends to misplace things around the home and then blames others. He also forgets conversations and may not follow through with things. His speech is also unintelligible at times, with poor enunciation.

With respect to personality function, Mr. Ewing has displayed self-centered behavior characterized by quickness to anger when "things don't go his way". He may be verbally aggressive and use profanity toward others at such times. He may also have limited self-discipline at present with respect to managing his nutrition, though he does handle basic ADLs without difficulty. She is particularly concerned about his decreased behavioral inhibition and signs of sexual preoccupation, the latter a significant departure from his premorbid function. His judgment may further be impaired and he shows a continual restlessness since he has returned to the home. His relationship with his son may also be altered somewhat at this time.

Clinical Interview:

Mr. Ewing presented as a neatly groomed (though unshaven) casually dressed man of age-appropriate appearance who ambulated without difficulty or assistance at the time of evaluation. He did wear a right arm sling. Mr. Ewing was pleasant, alert, and oriented in all spheres, maintaining good eye contact with the examiner. His speech was spontaneous, coherent, relevant, and fluent. No problems with word finding or paraphasia were evident. He was also able to provide an adequate chronological history.

Mr. Ewing was appropriate in affect and denied present depression. He did endorse some initial sleep insomnia and awakening in association with his pain. His energy level has been good during the day, as has been his appetite. He also related intact libido. Mr. Ewing looked forward to discharge in the next two weeks to his grandmother's home where his mother also resides.

Tests Administered:

Records Review
Clinical Interview
Parent Interview
Neuropsychology Questionnaire
Neuropsychological Symptom Checklist
Test of Memory Malingering (TOMM)
Wechsler Adult Intelligence Scale – Third Edition (WAIS-III)
Seashore Rhythm Test
Paced Auditory Serial Addition Test
Trail Making Test
Digit Vigilance
Category Test
Reitan-Indiana Aphasia Screening Test
Controlled Oral Word Association
Category Fluency
California Verbal Learning Test – Second Edition
Rey Complex Figure
Wechsler Memory Scale – Third Edition (Logical Memory/Visual Reproduction)
Hand Dynamometer
Finger Tapping
Motor Programming Exam
Personality Assessment Inventory

4

Neuropsychological Evaluation
Geoffrey Ewing
-Page Five-

**Validity of Patient Effort & Findings:**

Mr. Ewing was cooperative and conscientious with all test procedures. He was attentive to instructions and comprehended these well, though at times lost track of his responding in mid-task. He worked in a persistent fashion throughout testing. His verbal productions were intact and he exhibited no obvious dysphasia. Visually, he wore lenses, but complained of some focusing problems. Manually, he had minimal use of his right hand and bimanual and manual procedures were completed with the left upper extremity alone. Overall, Mr. Ewing was observed to put forth a good effort throughout the testing process.

Mr. Ewing was also administered a test of symptom validity (TOMM) requiring him to learn and later recognize simple visual shapes. This task is easily completed by a majority of brain impaired individuals. Mr. Ewing obtained a score of 40/50 on trial 1, 50/50 on trial 2, and 50/50 on the retention trial of the TOMM. This is a normal performance, consistent with an individual applying optimal effort in the testing process. Thus, both behavioral and formal observations of patient motivation during testing suggest that current findings likely accurately represent Mr. Ewing's present cognitive and emotional status.

Neuropsychological Results:

Intelligence: Mr. Ewing obtained a WAIS-III Verbal IQ in the Average range (105), exceeding 63% of age mates. His Performance IQ was significantly lower in the Borderline range (72), exceeding only 3% of peers. His Full Scale IQ was at the top of the Low Average range (89), exceeding 23% of age mates. The 33-point difference between Mr. Ewing's verbal and performance IQ scores is seen in only 0.5% of the general population. Age-adjusted scaled scores for the WAIS-III are presented below:

| Verbal Subtest | Scaled Score | Performance Subtest | Scaled Score |
|---|---|---|---|
| Vocabulary | 11 | Picture Completion | 04 |
| Similarities | 08 | Digit Symbol-Coding | 06 |
| Arithmetic | 10 | Block Design | 07 |
| Digit Span | 14 | Matrix Reasoning | 05 |
| Information | 11 | Picture Arrangement | 05 |
| Comprehension | 12 | Symbol Search | 06 |
| Letter-Number Sequencing | 08 | | |

Mr. Ewing had average higher-level Verbal Comprehension abilities (Index=100). He had a good fund of factual knowledge and vocabulary, suggesting benefit from his past interests and academic exposures. His conventional knowledge exceeded 75% of age peers when in situations requiring applied reasoning and judgment. Mr. Ewing was slightly weaker, and only low average, on a measure of verbal concept formation nevertheless and this may represent a relative change in his abstract reasoning skills.

Mr. Ewing was variable in his Working Memory skills (Index=104). He was near-superior on a number connection task, but only low average in tracking and separating letter-number strings. He was average in completing mental arithmetic problems. He required repetition of a number of these latter items.

Mr. Ewing was uniformly weak in his higher-level Perceptual Organization abilities (Index=72). Moreover, lower scores here did not appear to primarily arise from his use of his nondominant left hand in isolation in completing tasks. Indeed, his best score occurred on a block construction measure requiring him to work manually under timed conditions. Despite using his left hand only, he was low average in level. Further, problems seen on this subtest were present in his analysis of items as he was unsuccessful even when allowed unlimited time. Mr. Ewing was additionally impaired on a matrix analysis task that was untimed and had few manual requirements. Thus, some weakness and variability in Mr. Ewing's abstract visual-spatial skills is seen. Mr. Ewing was also impaired in sizing up sequential pictures and making inferences concerning outcome. His orientation to detail here was weak and this may in part relate to issues with visual acuity. Moreover, problems were also seen on another test of detail

5

Neuropsychological Evaluation
Geoffrey Ewing
-Page Six-

orientation requiring him to identify essential missing elements in pictures. Mr. Ewing was borderline in level (Index=79) on Processing Speed measures of the performance section requiring visual search, scanning, and a visual-motor output. Such measures were likely directly influenced by use of his non-dominant extremity in their completion.

Overall, intelligence testing suggests general preservation of verbal intellectual abilities, but suppression of performance-based functions at this time.

Attention & Information Processing: Mr. Ewing was low average for his age and education in discriminating rhythm patterns on a measure of auditory attention. In light of his manual difficulties, the examiner recorded his responses on this measure. This is consistent with his intact working memory processing in WAIS-III verbal section. Nevertheless, Mr. Ewing struggled to complete a test of divided attention requiring him to add numbers at increasingly faster rates. Here, he lost track of performance requirements at several points and could not keep up with these externally paced stimuli. Ultimately, the procedure was discontinued at the mid-point. Thus, although Mr. Ewing can focus well towards basic auditory information, he may have some processing speed deficits as well as difficulties in multitasking mentally.

Mr. Ewing was low average in completing a number connection task on paper assessing visual attention. He was mildly-to-moderately impaired in speed and moderately-to-severely impaired in accuracy on a number cancellation task, however, that required vigilance. While his reduced speed is likely in association with use of his nondominant left hand, his omission errors may suggest visual tracking impairment or fluctuating capacity for mental persistence. Indeed, he did complete sections of this task with reasonable accuracy. Notably, no problems were seen with attention to either the left or right fields on this task. These measures combine with processing speed measures of the WAIS-III in suggesting that Mr. Ewing struggles at present in his visual attention and tracking skills.

Problem-Solving & Executive Abilities: Mr. Ewing was moderately impaired in his speed on an alternating number-letter sequencing task requiring him to shift his direction of attention. He also made three errors suggestive of loss-of-set on this measure. That is, he tends to lose track of his responding in mid-task at times. Mr. Ewing was severely impaired for his background in completing a complex test of reasoning and logical analysis requiring him to use corrective (success/failure) performance feedback. He made 120 errors on 208 items of the Category Test. Here, he struggled throughout this measure to acquire solution strategies. Moreover, he was unable to alter these with changing conditions. This may indicate issues in both conceptual processing and other aspects of executive function such as set maintenance and mental flexibility. Notably, even when functioning accurately for a period of time on individual sections, Mr. Ewing could not sustain such processing. He may thus be significantly impaired in his ability to organize, plan, implement, and evaluate his problem solving behavior in less routine or novel situations.

Visual-Spatial Abilities: Mr. Ewing was impaired for his age in his drawn reproduction of a complex figure. Despite lenient scoring of his drawing in light of his use of his nondominant left hand, Mr. Ewing did show problems with organization and oversight of his performance here. He also rotated the stimulus. Mr. Ewing also had some problems with easier figure drawings, though these may also arise in part from his limited fine-motor skills with his left hand. Overall, these findings are nevertheless consistent with Mr. Ewing's weakness with visual-spatial/constructional processing on the WAIS III performance section.

Language Abilities: Mr. Ewing was intact on screening measures of basic language functions such as reading, spelling, and simple calculation. He wrote with difficulty with his left hand nevertheless. Mr. Ewing did exhibit some slowness in his identification of shapes on a screening measure of naming skills but was otherwise intact in naming and word finding. Further, his phonemic fluency was superior in level with category fluency ranging from average to low average across trials. Screening of other language functions found intact complex repetition and praxis, though some mild right-left confusion.

Learning & Memory: Mr. Ewing was average for his age in his overall learning and recall of a lengthy unstructured word list presented over several rehearsal trials. He was able to master 10 of 16 items by the completion of training. However, he fell significantly in his recall (3 words) following a brief delay during which he was exposed to distraction. When given semantic cues at that time, he improved to an average level. He also

Neuropsychological Evaluation
Geoffrey Ewing
-Page Seven-

declined once more following a lengthy delay (6 words), a borderline impaired score. When given semantic cues here, he again improved (8 words) but remained at a borderline level. Mr. Ewing was observed to make numerous intrusive and confabulatory errors across recall trials in addition. That is, he struggled to separate learned from extraneous material in his memory recall. This was also seen on a recognition trial. Here, he could identify 13 of 16 list items among distractors, but endorsed 9 false positive (non-target) items at that time. His ability to acquire new well-rehearsed auditory-verbal material may thus be relatively intact though his retrieval of such learning is subject to significant variability when cues are not present in his environment.

Mr. Ewing was average in both his immediate and delayed recall of oral material in context (short stories). Here, he was able to retain 76% of details. Moreover, under recognition conditions, he correctly identified 26 of 30 story elements. Overall, few problems were seen with Mr. Ewing's learning or storage of new oral material though he is vulnerable in his retrieval when dealing with less structured oral information.

Mr. Ewing was moderately impaired in both his immediate and delayed recall of a complex figure. Once more, he rotated all designs and exhibited significant disorganization in his drawings as well as perseveration of elements. This would again be suggestive of influence from his executive deficits as well as visual-spatial issues. Notably, Mr. Ewing was able to identify this stimulus among competing alternatives, but was unable to identify details among competing alternatives. Mr. Ewing was mildly impaired in both his immediate and delayed recall of simple figural input presented briefly. He also failed to recognize these stimuli among competing alternatives under a cued condition. These findings indicate that Mr. Ewing is significantly weaker in his visual than verbal memory processing at this time. Moreover, his deficits here may not entirely arise from manual or visual impairments.

Motor Abilities: Mr. Ewing was severely impaired in his right hand grip strength (2 kg), but average with his left (45 kg). Simple motor speed skills could not be evaluated on a tapping task with his right hand. His left hand was low average here. Assessment of complex motor programming was also undertaken with his left hand alone due to his right hand/wrist injuries. That extremity was variable. He could complete a finger touch procedure here but was unable to accurately complete any sequential movements with that extremity. Bimanual procedures were not administered. Response inhibition testing was intact on go/no-go processing tasks when the patient was allowed to use a shoulder shrug in lieu his right hand on some procedures.

Personality & Emotional Function:

Mr. Ewing responded to items of the Personality Assessment Inventory in a generally open and honest fashion. His profile is characterized by a single clinical scale elevation associated with physical health concerns. Individuals with this pattern may be singularly focused upon changes in their functioning in this area. This is not unusual for an individual recovering from multiple traumatic injuries. Notably, the patient relates few signs of any current emotional distress in the form of anxiety or depression. His present personality function is characterized by a normal level of self-confidence and optimism. Nevertheless, his external demeanor may mask underlying self-doubt when he considers the impact of his injuries upon his future functioning.

This evaluation finds no signs of any suicidal ideation or problems with reality orientation. Mr. Ewing is further a dominant, self-assured individual in social situations and likely has had leadership qualities. He can be irritable and demonstrate anger nevertheless when frustrated. There are also mild indications of a past tendency to use alcohol to manage stress.

Overall, Mr. Ewing's PAI profile is highly consistent with that obtained on the MMPI-2 administered to him at CNS on 7/16/10, which was also within normal limits with the exception of a scale relating to physical health concerns. There is thus the potential that this gentleman may possess limited insight into aspects of his current behavioral or emotional functioning, given his predominant focus upon his physical injuries and his recovery from these conditions. Observations of his behavior under less-structured conditions may provide a more reliable indication of his psychological adjustment at this time than his self-report.

7

Neuropsychological Evaluation
Geoffrey Ewing
-Page Eight-

Conclusions:

In summary, this evaluation finds significant persistent deficits in performance intelligence and other neurocognitive abilities four months into this gentleman's recovery from his significant traumatic brain injury. At this time, Mr. Ewing demonstrates impairment in information processing speed/working memory, visual-motor speed, executive functions, visual-spatial/constructional skills, complex verbal memory retrieval, visual learning & memory, and aspects of motor function. He is, conversely, relatively more intact in his academic & conventional knowledge, basic verbal problem solving, simple auditory attention, receptive & expressive language skills, complex verbal learning, contextual verbal memory, and left hand strength and speed skills.

Mr. Ewing exhibits generally adequate focusing upon auditory input, but experiences problems when material is externally paced or extensive re-organization mentally is required. He operates quite well when able to apply known rules and procedures, nevertheless, such as in completing mental arithmetic problems. His visual attention is more significantly impaired. Although his use of his nondominant extremity on motor procedures in this evaluation certainly contributed to lower scores, his visual detail orientation and tracking are weak, even when manual demands are not great. Primary contribution of visual issues to these latter findings cannot be ruled out nevertheless, though no obvious signs of visual inattention or neglect were present in testing.

Mr. Ewing's higher-level problem solving and executive deficits are perhaps his most significant impairments at this time. He may be less organized and planful in carrying out problem solving behavior. He further has problems remaining on task and issues with set-maintenance as well as cognitive flexibility are evident. This may make him much less adaptable in handling unexpected or unanticipated events in daily life.

Mr. Ewing's struggles on visually mediated manual performance functions. Again, his dominant-motor and visual impairments may play a role. These are not believed to entirely account for the extent of the difficulties seen, however. He shows problems with visual rotation and integration suggestive of perceptual issues at this time. Moreover, his visual memory processing is impaired in addition. Verbal memory is weaker only in situations that present a high degree of interference or the acquisition of less structured or organized material.

Finally, Mr. Ewing exhibits a current inability to use his right upper extremity though this likely arises from peripheral factors in association with his trauma injuries. His left hand is functional in most areas, but with reduced motor programming seen on complex procedures.

Although multi-determined, current neuropsychological findings are consistent with continued sequelae from a significant traumatic brain injury. Within a generalized pattern, frontal and right hemisphere systems are particularly implicated and this is consistent with some of his findings on neuro-imaging procedures. These acquired deficits are likely exacerbated by visual and/or motor limitations with this gentleman, as discussed elsewhere.

Mr. Ewing has progressed significantly in his recovery through his intensive rehabilitation over the past several months. At this point, he is nevertheless believed to be far from his baseline functional level, with significant further improvement expected in the months/years ahead. Mr. Ewing certainly requires continued intensive rehabilitation to address his residual issues. With his improved ambulation and capacity for articulate speech conversationally, the extent of his thinking issues may not always be immediately apparent to others. Moreover, he may experience some limitations in his self-awareness as a result of his brain injury that may further make him vulnerable to judgment errors in taking on life tasks and challenges.

It appears that Mr. Ewing has made significant strides physically in resuming self-management of ADLs. He nevertheless will likely continue to require cueing for some functions in light of his executive and memory issues. Moreover, his prospective memory, or capacity to anticipate and carry out future necessary activities, may be compromised. This is not well evaluated in the office setting. Thus, some oversight or cueing for maintaining nutrition, medication taking, and financial transactions will be necessary as he continues in his recovery. It will be important for Mr. Ewing to continue to work with others in managing medical and financial decision making. He also continues to remain unable to drive, from both a cognitive perspective and in light of his visual issues. A driving evaluation in the future may greatly inform such decision making.

Neuropsychological Evaluation
Geoffrey Ewing
-Page Nine-

Mr. Ewing continues to remain disabled for any imminent return to his job. He could not handle the multiple demands of a classroom teaching position at this point. Moreover, he could not juggle such challenges with those of full-time coaching.

Emotionally, Mr. Ewing demonstrates few overt signs of anxiety or depression and may be seeing benefit from both his antidepressant regimen and counseling at CNS. He does nevertheless show egocentric behavior, anger-proneness and decreased emotional reactivity at this time. He may additionally possess some underlying adjustment issues but struggle to access and report internal thoughts or feeling as a result of his brain injury.

Overall, Mr. Ewing has shown significant strides in his recovery over a relatively short period of time. With continued intensive outpatient rehabilitation, such as the CNS day-treatment program, he will likely continue to improve further in the months ahead. He has numerous strengths and a supportive family that should benefit him in his ultimate return to work and a productive, satisfying lifestyle in the future.

Recommendations:

1. Continued involvement of Mr. Ewing in the CNS program. An extended period of day treatment is recommended in order to build upon gains made while in the residential program.

2. Continued use by Mr. Ewing of compensatory strategies to manage his present cognitive deficits. These would be most important in the area of executive function where he may require external structure and cueing. However, he may also benefit from supports in the visual area as well as in his memory processing.

3. Identification later in rehabilitation of the potential for this gentleman's return to work in a lighter duty status. Should this not be feasible, other work alternatives may need to be explored with him.

4. With significant further recovery, consideration of Mr. Ewing's undergoing a driving evaluation.

5. Continued ophthalmologic follow-up for Mr. Ewing given his ongoing issues with visual processing.

6. Provision of the opportunity for individual counseling throughout Mr. Ewing's program at CNS and thereafter as he adjusts to his changed status and makes decisions concerning the future.

7. Neuropsychological reevaluation in one year to further document recovery of cognitive function and inform prognosis surrounding future function and necessary supports for this gentleman at that time.

I will be meeting with Mr. Ewing and his family at their convenience to discuss my findings. Thank you for referring this gentleman for neuropsychological evaluation.

*Ronald G. Paulman, Ph.D.*

Ronald G. Paulman, Ph.D.
Clinical Neuropsychology

RGP:zy

**2**

**Rodney Isom, Ph.D.**
*Isom Rehabilitation Consulting*
4201 Wingren Drive, Suite 112
Irving, TX 75062
(972) 650-6141
Fax (972) 541-1759
isomrehab@gmail.com

1/11/2011

David Allen
Stacey and Conder, LLP
901 Main Street, # 6220
Dallas, Texas 75202

      RE: Civil Action No. 3:10-cv-1211-0; *Barbara Ewing, et al. v. Iron Tiger Logistics Inc. and Kenneth Dewayne Bunton*; In the United States District Court, North District of Texas, Dallas Division
      Stacy & Coner file#: 1093-10-400

Dear Mr. Allen

Thank you for this referral. As you aware I received this file 12/9/10. I have reviewed all the records submitted (see below). At this point in time, given the evaluations that have been done, it is premature to determine the effects and probable outcomes and future needs of this individual.

Mr. Geoffrey Ewing is a 39 year old male who completed a bachelor's degree and later earned his teaching certificate and was working as a teacher at the time of his motor vehicle accident, March 18, 2010. He underwent a complete neuropsychological examination on 7/20/2010. His only complete neuropsychological exam occurred 3 months and two days post injury. Typically, you want to have a neuropsychological performed 12 months post injury. The reason for this repeated examination is that there can be significant improved in individuals who suffered traumatic brain injury within in that time frame, with significant spontaneous recovery occurring between the sixth and twelfth month post injury. There is quite a bit of literature that supports this diagnostic need for repeated examination. Lezak indicates that spontaneous recovery will be seen for some time but after the first year improvement may slow down and that general agreement would indicate, "spontaneous improvement levels off no later than the time with the second year after injury." Lezak, M.D., (1995). Neuropsychological Assessment, third edition, New York, Oxford Univery press. Reitan and Wolson conducted an 18-month longitudinal study of deficits associated with traumatic brain injury by examining patients shortly after brain injury and at 12 and 18 months following the initial evaluation. Neurological evaluations, EEGs, and extensive neuropsychological evaluations were done at each follow-up examination. A trend analysis revealed a significant degree of cognitive improvement over the first 12 months following injury in both minor and severe traumatic brain injured individuals, Reitan, R.M. & Wolfson, D. (1988). Traumatic Brain Injury, Volume II: Recovery and Rehabilitation. Tucson: Neuropsychology Press. Both of these citations clearly show the need for re-examination no

1

sooner the 1st anniversary of the injury, although, the literature does show that spontaneous recovery can occur years after the event.

Mr. Ewing, was seen again by Dr. Richard Fullbirght, Ph.D, in October and November of 2010, there was no formal objective testing done at that time. You could anticipate significant gains in the last quarter or after 9-12 months post injury. The need to re evaluate Mr. Ewing after March of 2011 is highly recommended and would be needed to reliably determine his employment opportunities, his ability to benefit from vocational rehabilitation, what his earning capacity is and whether he has suffered an earning capacity loss or not. Additional, the same is true of what his future needs are. An individual's medical, self care abilities and future care needs can change dramatically from the post acute phase (6-8) months post injury to one year post injury. Determinations made regarding his medical and future care needs made prior to that first anniversary would be unlikely to be reliable and you would not expect an accurate prediction what his care needs are for the foreseeable future.

I have been a practicing rehabilitation counselor since 1977 working with individuals with Brain Injury. I served as the Director of the graduate program in Rehabilitation Counseling at the University of North Texas until my retirement in 2008. During my years as a Professor at The University of North Texas, I have taught, assessment (test and measurements), and Medical and Psychological aspects of disability. I have always taught my students that they must wait until after the first anniversary of event that lead to the Traumatic Brain injury before evaluating the individuals potential to benefit from vocational rehabilitation or what their long-term care needs are. This practice is consistent with all the literature I have read and my own professional experience working with this population.

Records Reviewed:

| Provider | Type of Documents | Date |
|---|---|---|
| • City of Denison Emergency Medical Services | Medical | 03/18/10 |
| • Air Evac Lifeteam | Medical | 03/18/10 |
| • Air Evac Lifeteam | Billing | 03/18/10 |
| • Parkland Health & Hospital System [Vil.1-Vol.5] | Medical | 03/18/10-04/05/10 |
| • Parkland Health & Hospital | Billing | 03/18/10-04/05/10 |

2

System

- Life Care Hospital of Dallas          Medical          04/05/10-04/14/10
  [Vol.1-Vol.2]

- Life Care Hospital of Dallas          Billing          04/05/10-04/17/10

- Southwest Pulmonary Assoc. Billing          04/05/10

- Physical Medicine Consultants          Billing          04/06/10-04/07/10

- Baylor Institute for Rehabilitation          Medical          04/14/10-05/19/10

- Baylor Health Care Systems          Medical          04/15/10-05/11/10

- Baylor Health Care Systems          Billing          04/15/10-05/11/10

- American Radiology Consultants          Billing          04/15/10-05/12/10

- Pathologists Bio-Medical          Billing          04/15/10-05/18/10
  Laboratories

- Dr. Michael B. Kronenberg          Billing          04/19/10

- Centre for Neuro Skills          Medical          05/14/10-09/13/10
  [Vol.1-Vol.2]

3

3

# WOODFIN NEUROLOGICAL CLINIC, P.A.

William S. Woodlin, M.D.

BOARD CERTIFIED - Adult Neurology

January 10, 2011

Mr. David G. Allen
Stacy & Conder, LLP
901 Main St., Suite 6220
Dallas, TX 75202

Re:  Civil Action No. 3: 10-cv-1211-O; Barbara Ewing, et al. v. Iron Tiger Logistics, Inc.
     and Kenneth Dewayne Bunton; In the United States District Court, North District of
     Texas, Dallas Division
     File No.: 1093-10-400

Dear Mr. Allen;

I have reviewed records and videos from the following sources in regard to this case:

City of Denison Emergency Medical Services

Air Evac Lifeteam

Parkland Health & Hospital System [Vol. 1 – Vol. 5]

Lifecare Hospital of Dallas [Vol. 1 - Vol. 2]

Southwest Pulmonary Assoc

Physical Medicine Consultants

Baylor Health Care Systems

American Radiology Consultants

Pathologists Bio-Medical Laboratories

Dr. Michael B. Kronenberger

15

Centre for Neuro Skills [Vol. 1 – Vol. 2]

Premier Plastic Surgery of Texas/Patty K. Young, M.D.

Ronald G. Paulman, Ph.D./ Neuropsychological Evaluation Report

Baylor Regional Medical Center of Plano/ Operative Report & Discharge Summary

Baylor Institute for Rehabilitation

Unum (Disability Records)

Radiology Films for Geoffrey Ewing, II produced by Plaintiffs' attorney on 7/23/10 and labeled as "Parkland Films I",  "Parkland Films II", and "Parkland Films III";

Video's taken of Geoffrey Ewing, II produced by Plaintiffs' attorney on 7/23/10 and labeled as "CNS Video – Tape 1" and "CNS Video – Tape 2"; and

Video taken of Geoffrey Ewing, II produced by Plaintiffs' attorney on 7/23/10 and labeled as "LifeCare Hospitals 4/12/2010".

Plaintiffs' experts' reports

I have been in the full time practice of adult clinical neurology in the greater Dallas area since 1975 and have treated acute and chronic closed head injuries and disorders of the peripheral nervous system including the brachial plexus on a regular basis. I routinely obtain formal neuropsychological testing to assess my patients with cognitive and/or emotional disorders and employ the results in advising to and treating my patient. I routinely perform clinical and electromyographic examination on patients with disorders of the peripheral nerves and am well acquainted with the course of recovery from nerve injuries. My training in diseases of the peripheral nerves began in 1974 at the National Hospital for Nervous Disease, London, England, with Prof. Roger Gilliatt, one of the world's leading investigators of peripheral neuropathy. I have had a special interest in the field since that time.

I am board certified in Neurology and taught senior medical students and neurology residents on a regular basis from 1975 through 2008 and on an intermittent basis since that time. I am a Clinical Associate Professor of Neurology at University of Texas Southwestern Medical School. On the basis of my education, training and experience I feel well qualified to comment on the injuries Mr. Ewing sustained.

Mr. Ewing incurred a closed head injury and injury to his right radial nerve and right brachial plexus when his Dodge Stratus sedan was rear-ended by an International truck driven by Mr. Bunton on 03/18/10. Mr. Ewing received acute care at Parkland Memorial Hospital, additional inpatient care at Lifecare Hospital, inpatient rehabilitation at Baylor Institute of Rehabilitation and both inpatient and outpatient rehabilitation at the Centre for Neuro Skills. He suffered a

**16**

cerebral contusion involving the right frontal and temporal regions, an injury to his right radial nerve in association with a fracture of the distal right radial bone and right brachial plexus injury in association with multiple rib fractures on the right.

From my review of the medical records it is clear that he has made significant progress in recovering from his closed head injury and has had improvement in the motor and sensory function of his right arm and hand.

To assess his brain function he underwent formal, detailed neuropsychological testing on 07/20/10 by Dr. Ron Paulman. This was only four months following his injury.

He has had treatment for his peripheral nerve injuries since 06/15/10 from Dr. Patty Young . I have her records from that visit and a subsequent visit of 09/14/10. At that last visit she was planning exploratory surgery and possible nerve grafting. I do not have operative or other records.

At this point the most striking aspect of this case from a neurological perspective is the difficulty of providing a prognosis for both the head and peripheral nerve injuries so soon after the accident. I suggest that in order to give fair and reasonable consideration to all parties that additional observation is required.

I suggest that Dr. Paulman, who enjoys an outstanding reputation in this community, repeat detailed, formal neuropsychological testing one year following the 03/18/10 accident. In all probability this will show improvement and give a much more valid indication of the future trajectory of Mr. Ewing's overall functioning.

I suggest that Dr. Young be given the opportunity the to observe the results of any nerve grafting for at least six months following the surgery. Mr. Ewing stands a reasonable chance of regaining muscular function in his right arm for up to approximately two years after his injury.

Both Dr. Paulman and Dr. Young should be able to provide  significantly more accurate assessments of Mr. Ewing's current and long term status with implementation of these recommendations.

I reserve the opportunity to alter my opinions pending the disclosure of additional information.


Respectfully submitted,

William S. Woodfin, MD

17

4

NEUROPSYCHOLOGY CLINIC, P.C.
Leslie D. Rosenstein, Ph.D.
Board-Certified in Clinical Neuropsychology
American Board of Professional Psychology

Mr. David G. Allen
Stacy & Conder, LLP
901 Main St., Suite 6220
Dallas, Texas 75202

January 10, 2011

Re: Ewing V. Iron Tire

Dear Mr. Allen:

I have reviewed medical records as well as records related to the accident of March 18, 2010. I am still in need of records or more detailed information from an evaluation completed in 1999 or 2000, the Parkland Hospital Discharge Summary, raw test materials from an evaluation completed in July by Dr. Paulman, and more detailed information regarding previous academic and employment history as well as records or details from three reported previous concussions and a neck injury. It should also be noted that the following opinions are based strictly on record review; Mr. Ewing has not been interviewed or evaluated directly by me. The validity and reliability of my opinions expressed below are thus limited to the extent that the information provided in the records is reliable and valid. Further, my opinions are limited in that they reflect only my opinion based on the record review. It should additionally be noted that my opinions outlined below are based on records available to me as of January 10, 2011, and could be modified if new information is to become available. However, based on the records I do have, and with the above caveats, I have the following opinions and comments.

On March 18, 2010, Mr. Ewing was involved in a motor vehicle accident in which he reportedly sustained orthopedic injuries, pulmonary contusions, and a brain injury. He has not had a neuropsychological evaluation, to my awareness, since July 20, 2010, just four months post-injury. Therefore, it is not possible to speculate with any degree of certainty what his prognosis is for recovery and future functioning. More specifically, one would expect a significant degree of further recovery for a continued period of time well beyond four months post injury; Dr. Paulman also noted this in his report and recommended re-evaluation one year from the time of his July 2010 evaluation. In addition, without reviewing the raw test materials from the July evaluation, I am left with questions regarding the impact of the reported visual field defects on test performances and how the interpretation of the test findings may be impacted. Finally, there have been references to a past evaluation, in 1999 or 2000, in which there were some atypical findings. Without the results from that evaluation, it is difficult to know how and to what degree current cognitive/neuropsychological functioning may differ from previous functioning.

I hope the above comments and notes are helpful. Please let me know if I can be of any further assistance.

Respectfully,

Leslie D. Rosenstein, Ph.D.

1600 W. 38th St., Suite 421
Austin, TX 78731
Phone/Fax: 512-454-9429

18